IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MINNY FRANK,                                    Case No. 6:11-cv-06402-AA
                                                OPINION AND ORDER
          Plaintiff,

     v.

CASCADE HEALTHCARE COMMUNITY,
INC. dba ST. CHARLES MEDICAL
CENTER; EDWARD PALMER, MD;
REBECCA TIMMS; SCOTT NAMANNY;
THE CITY OF BEND; BEND POLICE
DEPARTMENT; and CENTRAL OREGON
EMERGENCY PHYSICIANS, LLC;

          Defendants.
_____

Minny Frank
1803 Buttermilk Lane
Arcata, California 95521
     Pro se plaintiff

Robert E. Franz, Jr.
Law Office of Robert E. Franz, Jr.
P.O. Box 62
Springfield, Oregon 97477
     Attorney for defendants the City of Bend, the Bend Police
     Department, Scott Namanny, and Ian Macdonnell

Page 1 - OPINION AND ORDER

Steven P. Jones
Kirstin L. Abel
Keating Jones Hughes PC
One S.W. Columbia, Suite 800
Portland, Oregon 97258
      Attorneys for defendants Cascade Healthcare Community, Inc.
      d.b.a. St. Charles Medical Center, Rebecca Timms, Nichole
      Ryan, Patricia Violet, Christine Huffman, Penni Lancaster,
      Randal Mcbride, Jonathan Beutler, and Justin Nelson

Gordon L. Welborn
Erika Lyn Wilson
Hart Wagner, LLP
439 S.W. Umatilla Avenue
Redmond, Oregon 97756

Karen M. O'Kasey
Hart Wagner, LLP
1000 S.W. Broadway, 20th Floor
Portland, Oregon 97205
      Attorneys for defendant Edward Palmer, M.D. and Central Oregon
      Emergency Physicians, LLC

AIKEN, Chief Judge:

      Defendants Edward Palmer, Central Oregon Emergency Physicians,

LLC ("COEP"), the Bend Police Department,[1] the City of Bend

("City"), Cascade Healthcare Community, Inc. d.b.a. St. Charles

Medical Center ("SCMC"), Rebecca Timms, Nichole Ryan, Patricia

Violet, Christine Huffman, Penni Lancaster, Randal Mcbride,

Jonathan Beutler, and Justin Nelson move for summary judgment,

pursuant to Fed. R. Civ. R. 56, on all of plaintiff Minny Frank's

---

      [1] The Bend Police Department "is not a separate entity from
the city itself and thus not amendable to suit." Keller v. City
of Portland, 1998 WL 1060222, *3-4 (D.Or. Nov. 13, 1998). As
such, the Bend Police Department is dismissed as a defendant from
this action. Due to plaintiff's pro se status, however, the
Court will construe any allegation against the Bend Police
Department as though it was asserted against the City.

Page 2 - OPINION AND ORDER

claims.[2]  Plaintiff also filed two motions for partial summary
judgment against Palmer, Timms, COEP, and SCMC.  For the reasons
set forth below, defendants' motions are granted and plaintiff's
motions are denied.  As a result, the claims remaining are those
asserted against defendants Scott Namanny and Ian Macdonnell.

### BACKGROUND

On January 13, 2010, after mixing three to four alcoholic
beverages with at least a dozen prescription anti-anxiety pills,
plaintiff became extremely intoxicated and repeatedly threatened
her life in the presence of her husband.  Plaintiff suffers from
mental illness and has previously been hospitalized for her
psychological issues; knowing this and fearing for her well-being,
plaintiff's husband called 911.  Officers Namanny, Paschke, and
Macdonnell were dispatched to plaintiff's residence.  When they
arrived, plaintiff was being restrained by her husband in a room
with two guns, one of which was loaded.  Plaintiff was
uncooperative with the police and, as a result, they forcibly hand-
cuffed and Mirandized her.

Thereafter, the police interviewed plaintiff, during which she
admitted that she had held a gun to her stomach intending to harm
herself; plaintiff later indicated that she was not sure why she

---

[2] Defendants filed several separate motions for summary
judgment; because their arguments significantly overlap, except
where otherwise indicated, the Court will address defendants'
respective motions together.

threatened self-harm. Namanny explained to plaintiff that he felt it would be in her best interest to speak with a mental health specialist at SCMC. Plaintiff expressed a willingness to go to the hospital. As such, Namanny and Macdonnell brought plaintiff to the emergency department ("ED") of SCMC, a private, non-profit hospital, pursuant to Or. Rev. Stat. § 426.228.

Upon admittance to the ED, and while waiting to be evaluated in a private room, plaintiff remained calm and compliant; however, when plaintiff was contacted by Timms, a licensed clinical social worker, she became combative and started yelling loudly, using vulgar profanity, because her handcuffs had not yet been removed. Plaintiff's uncooperative and aggressive behavior continued despite SCMC employees' calming efforts. Eventually, plaintiff was subdued, after which her handcuffs were removed, and was examined by Palmer and interviewed by Timms. Palmer, an ED physician, is not an employee of SCMC; rather, he is a member of COEP, a private company that contracts with SCMC to provide emergency services.

During her interview with Timms, plaintiff reported that she held a loaded gun to her head earlier that evening and wanted to kill herself. Plaintiff also reported that she drank four glasses of vodka and often harms herself via an overdose of prescription medication. Based on this information, and in conferral with Timms and Dr. Lakovics, the admitting physician, Palmer determined that plaintiff was a potential harm to herself and/or others and

initiated an emergency psychiatric hold in SCMC's psychiatric emergency services ("PES") unit. Plaintiff was subsequently informed that she was going to be held overnight in the PES unit and, as a result, needed to change into scrubs pursuant to hospital policy. Upon receiving this information, plaintiff again began yelling and became combative; she demanded to speak with the on-call ED doctor who evaluated her, refusing to change into scrubs or voluntarily admit herself to the PES unit. Palmer returned and informed plaintiff that it was his and his staffs' opinion that she needed further treatment. Plaintiff then erupted at Palmer and began personally threatening him, at which point Palmer ordered the administration of medication to plaintiff in order to effectuate her transition into the PES unit.

Plaintiff continued to refuse to change into hospital scrubs, even after being informed of SCMC's policy. As such, plaintiff was warned that she would be forcibly held down and changed into scrubs if she failed to comply; plaintiff still did not cooperate and, while screaming, demanded to see a patient advocate and a written copy of the hospital's policies. Plaintiff was then physically restrained by Namanny, Macdonnell, and SCMC staff while a female nursing assistant performed a skin-check and replaced plaintiff's existing clothes with hospital scrubs. Throughout this process, plaintiff remained volatile, yelling loudly and personally threatening those around her.

After plaintiff was changed into scrubs, she was transported to the PES unit.  During her admission to that unit, and pursuant to Palmer's earlier order, two male SCMC nurses injected plaintiff with a combination of Ativan, Haldol, and Benadryl, which were employed for their anti-anxiety and sedative properties.  Plaintiff was then medically monitored via video for the next several hours while she slept.  Plaintiff remained in the PES unit until the following morning, January 14, 2010, when she was discharged into her husband's care after a psychiatric evaluation revealed that she was no longer a threat to herself or others.

On December 9, 2011, plaintiff filed a complaint in this Court.  Since the commencement of this lawsuit, plaintiff has engaged in a campaign of harassment against defendants and their counsel, including but not limited to personal threats via email and online videos that accuse defendants of racism and bigotry.  On April 16, 2012, plaintiff moved to file an amended complaint; on May 16, 2012, plaintiff moved to file a second amended complaint.  On June 26, 2012, this Court granted plaintiff's motions.  Accordingly, on July 12, 2012, plaintiff filed a second amended complaint.  On September 21, 2012, after receiving leave from the Court, plaintiff filed her third amended complaint ("TAC"), alleging: (1) several negligence and negligent, reckless, and intentional infliction of emotional distress claims ("NIED," "RIED," and "IIED," respectively) under Oregon law; and (2)

deprivations of her Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

## STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of a dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. Id. at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the

underlying facts must be viewed in the light most favorable to the nonmoving party.  T.W. Elec., 809 F.2d at 630.

## DISCUSSION

This dispute centers on whether defendants' physical restraint and administration of certain medications was negligent or in violation of plaintiff's constitutional rights.

I.    SCMC's Policy Terms

Central to plaintiff's state and federal claims are several of SCMC's policies and procedures.  The first SCMC policy at issue, entitled "Mental Health-Protocol for Involuntary Admission of a Mentally Ill Patient," mandates that the "[p]atient will always be escorted to the Mental Health area by two staff members or a staff member and Police Officer."  Supplemental Ex. F to Pl.'s Second Mot. Partial Summ. J. ("Disrobing Policy") at 2.  Further, "[a]ll personal belongings are to be removed in [the ED and the patient must be checked] for medications and sharp objects."  Id. The patient is also "to be placed in hospital clothes in [the ED]." Id.  If a patient is determined to be out of control or a threat to herself or others, the Disrobing Policy requires the "nurse . . . to take immediate protective action [including asking] the Police Officer to assist as long as necessary [and using] locked door, medication, or restraints, as per 'Restraint and Seclusion' W10027."  Id.

The "Restraint and Seclusion" policy, in turn, authorizes the

Page 8 - OPINION AND ORDER

"direct application of physical force to an individual, without the individual's permission, to restrict his or her freedom of movement and to protect him or her from injuring self or others." Supplemental Ex. N to Pl.'s Second Mot. Partial Summ. J. ("Restraint Policy") at 3. As an initial matter, the "the use of handcuffs or other restrictive devices applied by law enforcement officials who are not employed by or contracted by the hospital" are not governed by this policy. Id. at 1. Rather, the purpose of the Restraint Policy is to "protect the patient's health and safety and preserve his or her dignity, rights, and well-being," and "utilize the least-restrictive means of containing patients who pose an immediate danger to themselves or others." Id. Accordingly, the patient's past medical history, including any history of sexual or physical abuse that would place the patient at greater psychological risk during restraint or seclusion, are considered when determining whether restraint is appropriate. Id. at 4.

The use of force is nonetheless warranted under the Restraint Policy where an "emergency" exists and a "licensed independent practitioner [or] qualified registered nurse" initiates it after making an initial assessment. Id. at 5. For the purposes of this policy, "emergency" is defined as "an instance in which there is an imminent risk of an individual harming himself or herself or others, including staff . . . when nonphysical interventions are

unrealistic and safety issues require an immediate physical response." Id. at 4 (ellipses in original).

A separate policy, entitled "Psychiatric Emergency Services Search Protocols," specifies that

> all patients, without exception, will have a person search and belongings search upon admission to the Facility [and] [a]ll patients will be searched at the time of admission to any PES bed, regardless of inpatient or outpatient status. For patients brought in by ED staff and/or police, the ED staff and/or police will be expected to remain until the search is complete.

Supplemental Ex. H to Pl.'s Second Mot. Partial Summ. J. ("Search Policy") at 1.  The primary purpose of this policy is to "ensure the safety of patients, physicians, facility staff, and visitors from dangerous articles, unauthorized medications, and other items which could cause harm." Id.  The Search Policy expressly prescribes a course of conduct where the patient refuses to be searched: "staff will explain the need for safety again and extra staff will be contacted if necessary" in order to effectuate the search. Id. "Patients will be searched in a room which provides adequate privacy and personal space . . . by two (2) staff members," which "[w]henever possible, . . . will be the same sex as the patient." Id. at 2.  During the search, the patient is required to disrobe and then is dressed in hospital scrubs. See, e.g., id. (describing the disrobing procedures).

Finally, SCMC has a procedure, entitled "Behavioral Control, Dr. Strong Code," which exists to "ensure the safety of patients,

visitors, and staff, and to obtain immediate assistance within the hospital in a behavioral emergency." Supplemental Ex. L to Pl.'s Second Mot. Partial Summ. J. ("Hold Procedure") at 1. Pursuant to this procedure, SCMC staff are to receive "four hours of seclusion and restraint training annually"; to maintain these skills, SCMC employees are also required to "participate in an actual seclusion or restraint event which is debriefed, or an unannounced drill quarterly." Id. A hold is authorized "[w]hen a patient is imminently dangerous to self or others and less restrictive, non-physical interventions have not been effective or are highly unlikely to be effective given the nature of the crisis." Id. Factors that are considered when placing a hold include the patient's "level of agitation, mental status, direct or implied verbal threats toward self or others, other interventions tried or not tried, paranoia, intoxication level, etc." Id. at 2. The Hold Procedure authorizes the use of restraint when medically necessary. Further, where restraint is medically necessary, this procedure specifies that "at least five, able-bodied, trained staff are required"; however, "[i]f there are not five, able-bodied, appropriately trained staff available, physical intervention is not recommended. Police assistance should be considered." Id. at 2-4. After the Hold Procedure is commenced, "[a]ll dangerous or potentially dangerous items are to be removed from the patient."

Id. at 4.[3]

II.  State Law Claims

Plaintiff's state law claims are premised on Or. Rev. Stat. §§ 426.005 through 426.390 and Oregon Administrative Rules ("OAR") 309-033-0200 through 309-033-0800, as well as SCMC's policies and procedures.

A.  Negligence Claim Against Palmer and Timms

Plaintiff asserts that Palmer and Timms committed medical malpractice by forcibly changing her into hospital scrubs and medicating her, especially because they knew that she had previously been a victim of sexual and physical assaults. Specifically, plaintiff argues that "Palmer owed her a statutory duty to personally oversee her care and treatment [and his] failure to obtain Plaintiff's informed consent" constituted negligence and negligence per se.[4]  Pl.'s Opp'n to Palmer's Mot. Summ. J. 3-4; see

---

[3] SCMC also has a policy, entitled "Patients in Custody," that provides guidance to corrections officers. See Supplemental Ex. to Pl.'s Resp. in Opp'n to City's Mot. Summ. J. The Court finds it unnecessary to outline the specific terms of this policy because it is largely duplicative and relates primarily to Namanny's and Macdonnell's conduct, which is not at issue in regard to the present motions.

[4] It is unclear whether plaintiff actually intends to assert a negligence per se or statutory tort claim based on defendants' alleged failure to follow the statutes, rules, and policies at issue; however, because "[t]he elements required to state a claim for both are the same," the Court will address them together. McAlpine v. Multnomah Cnty., 131 Or.App. 136, 144, 883 P.2d 869 (1994), rev. denied, 320 Or. 507, 888 P.2d 568 (1995); see also Cain v. Bovis Lend Lease, Inc., 817 F.Supp.2d 1251, 1255-56 (D.Or. 2011) (discussing the difference between negligence per se

<u>also</u> Pl.'s Mem. in Supp. of Second Mot. Partial Summ. J. 17; TAC ¶¶ 45-57.  In addition, plaintiff contends that Palmer was negligent because he failed to comply with the terms of COEP's contract with SCMC, which requires ED physicians to "[p]rovide the necessary Services in a manner so that the medical needs of each patient are met consistent with Hospital and medical staff bylaws, rules, regulations and policies." Pl.'s Reply to First Mot. Partial Summ. J. Ex. D.

> i.    <u>Common Law Negligence Claim</u>[5]

To prevail on a medical negligence claim, plaintiff must establish "(1) a duty that runs from the defendant to the plaintiff; (2) a breach of that duty; (3) a resulting harm to the plaintiff measurable in damages; and (4) causation, i.e., a causal link between the breach of duty and the harm." <u>Swanson v. Coos Cnty.</u>, 2009 WL 5149265, *5 (D.Or. Dec. 22, 2009) (citing <u>Stevens v.</u>

---

and statutory tort claims).

[5] "[A] state common-law claim of negligence may be maintained separately from a § 1983 claim only when [it] is based on facts that are different from the facts on which the § 1983 claims are based." <u>Barringer v. Clackamas Cnty.</u>, 2010 WL 5349206, *9 (D.Or. Nov. 22), <u>adopted by</u> 2010 WL 5342965 (D.Or. Dec. 21, 2010) (citations and internal quotations omitted). Here, a review of plaintiff's complaint and briefs reveals that her negligence claims against Palmer, Timms, and SCMC are premised on the same facts as her claims pursuant to 42 U.S.C. § 1983. For this reason, plaintiff's negligence claims fail. <u>See, e.g.</u>, <u>id.</u>  Nevertheless, in light of plaintiff's pro se status, and in order to provide the most complete disposition of her claims, the Court will address the substantive merits of her common-law negligence claims.

<u>Bispham</u>, 316 Or. 221, 227 851 P.2d 556 (1993)). "[A]s a general rule, a plaintiff in a medical malpractice case must offer expert testimony that, to a reasonable medical probability, the alleged breach of the standard of care caused the plaintiff's injuries." <u>Chouinard v. Health Ventures</u>, 179 Or.App. 507, 512, 39 P.3d 951 (2002); <u>see also</u> <u>Gulley v. Cook</u>, 1999 WL 805147, *4 (D.Or. Sept. 29, 1999) (citing <u>Getchell v. Mansfield</u>, 260 Or. 174, 179, 489 P.2d 953 (1971)). Nonetheless, such testimony is not required where the jury is capable of deciding what constitutes reasonable conduct or what caused the injury without the opinion of an expert. <u>See</u> <u>Getchell</u>, 260 Or. at 179-81; <u>Chouinard</u>, 179 Or.App. at 512-13.

Because this case involves a unique set of circumstances, including but not limited to complicated medical issues surrounding the treatment of an intoxicated, suicidal, and volatile mentally ill person with a history of abuse, expert testimony is necessary. In such instances, "a defendant doctor may offer his own medical expert opinion in an affidavit as evidence to support a summary judgment motion on the issue of the applicable standard of care." <u>Swanson</u>, 2009 WL 5149265 at *5 (citing <u>O'Gara v. Ptacek</u>, 96 Or.App. 39, 43, 771 P.2d 642 (1989); and <u>Tiedemann v. Radiation Therapy Consultants</u>, 299 Or. 238, 701 P.2d 440 (1985)).

Here, defendants provided a plethora of opinion evidence [6]

---

[6] It is undisputed that those authoring defendants' opinion evidence are all experts within the meaning of Fed. R. Evid. 702. Plaintiff does, however, challenge the admissibility of this evidence on a number of other grounds. <u>See, e.g.</u>, Pl.'s Opp'n to

Page 14 - OPINION AND ORDER

regarding the relevant standard of care and the reasonableness of
Timms' conduct, Palmer's conduct, and SCMC's policies.    Notably,
Palmer provided an affidavit regarding plaintiff's treatment while
in the ED.   Palmer reported that he "personally examined" plaintiff
and provided treatment in consultation with Timms, who provided a
more thorough evaluation.    Palmer Aff. ¶ 4.    He stated that,
"[d]uring the time period that Ms. Frank was in the ED, she became
agitated, combative, out of control, uncooperative and
threatening"; as a result, Palmer found it medically necessary to
"order . . . the administration of medications (Haldol, Ativan, and
Benadryl) to Ms. Frank to prevent harm to herself and the hospital
staff."   Id. at ¶ 5.   Palmer opined that his choice and methods for
administering the medications at issue, as well as his initial
decision to place plaintiff on an emergency psychiatric hold, were
reasonable under the circumstances and within the standard of care.
Id. at ¶¶ 4-7.   Further, Palmer clarified that he

> did not enter an order for Ms. Frank to be changed out of
> her street clothes and into hospital scrubs.   Rather, the
> hospital has its own policies regarding clothing for
> patients who are being admitted to the [PES] Unit, which
> required patients to be changed into hospital scrubs for
> safety reasons.

Id. at ¶ 7.   Palmer concluded that the care he provided to
plaintiff "met or exceeded" the standard of care in the relevant
community for an emergency room physician acting under the same or

---

SCMC's Mot. Summ. J. 5-6.   Regardless, the Court finds that these
affidavits and declarations fall within the purview of Fed. R.
Civ. P. 56(c)(4) and are therefore admissible.

similar circumstances and that "there was no negligent conduct on [his] part which caused or produced any harm or damage to Ms. Frank." Id. at ¶¶ 6-8.

Timms provided testimony regarding SCMC's policies for PES unit admittees:

> [SCMC] has a policy that patients who will be admitted to the [PES] Unit change into hospital scrubs and I am familiar with that policy. While the patient is changing into scrubs, or being changed, healthcare providers look for weapons and perform a skin check. The policy is in place for several reasons: first, it ensures patients do not have weapons that could be used to harm themselves or others; second, it ensures that patients do not have a clothing item that can be used to harm themselves or others; and third, at allows the providers to check the patients skin to look for any signs of injury.

Timms Decl. ¶¶ 7-8; see also Beutler Decl. ¶¶ 4-5; Powers Decl. ¶¶ 3-4.

In addition, Timms discussed her interactions with plaintiff on the night in question. Timms reported that, "[w]hile Ms. Frank was in the [ED] she was agitated, combative, uncooperative and threatening to hospital staff . . . and was generally incapable of controlling her actions." Timms Decl. ¶ 4. Timms also stated that, pursuant to Palmer's request, she performed a psychosocial assessment of plaintiff, during which "Ms. Frank informed me that she had a loaded gun pointed at her head that night wanting to kill herself [and] that she will often harm herself via an overdose, and that she had drank four glasses of vodka." Id. at ¶¶ 3, 6. She also spoke with the police officers who brought plaintiff to the ED, who "advised [Timms] that Ms. Frank had taken a handful of

Page 16 - OPINION AND ORDER

clonazepam, held a gun to her stomach, and held a knife to her throat." Id. at ¶ 6.  Timms concluded that all of the services she provided to plaintiff, as well as SCMC's policies, were, "to a reasonable degree of certainty, consistent with the community standard of care." Id. at ¶¶ 9-11; see also Powers Decl. ¶¶ 6-8; Ryan Decl. ¶¶ 9-10.

Ryan, who was working as the "Change Nurse" in the ED on the night in question, provided further testimony regarding the events surrounding plaintiff's forced change into hospital scrubs.  Ryan Decl. ¶ 3.  Ryan reiterated Timms' statement that plaintiff was agitated, combative, uncooperative, threatening to hospital staff, and generally out of control while in the ED.  Id. at ¶ 4. Moreover, Ryan stated that plaintiff repeatedly refused to change into hospital scrubs, even after being informed of SCMC's policy; accordingly, plaintiff "was advised that she would be assisted in changing into the scrubs if she would not agree to do so herself." Id. at ¶¶ 6-7.  Ryan testified that plaintiff "continued to refuse to change" and "threw the scrubs at staff." Id.  As a result, and

> [i]n order to protect Ms. Frank from harming herself or others, several people, including myself, one male [SCMC] nurse employee, and two Bend Police Department officers held Ms. Frank's head and limbs to prevent her from assaulting anyone, and a female nursing assistant used blankets or towels to keep Ms. Frank as covered as possible while she removed Ms. Frank's street clothing and replaced them with hospital scrubs.  The males in the room made every effort to avert their eyes from Ms. Frank.  They did not physically remove her clothing or redress her.  I was at the head of the bed, holding Ms. Frank's head, so I was able to see what was taking place throughout the change.

Page 17 - OPINION AND ORDER

Id. at ¶ 8.   Like Timms and Palmer, Ryan concluded that, "to a reasonable degree of medical certainty, all of the care provided to Ms. Frank while she was in the [ED] was consistent with the hospital policy requiring patients to change into scrubs, and was consistent with the standard of care."   Id. at ¶ 10.

Beutler, the night nurse who assumed plaintiff's care upon her admittance to the PES unit, opined that, "to a reasonable degree of medical certainty, all of the care provided to Ms. Frank while she was in the [PES] unit on January 13 and 14, 2010 was consistent with the community standard of care."   Beutler Decl. ¶¶ 3, 6-8. Powers, who is the manager of the PES unit, testified that "the care and services provided to" plaintiff, "the training provided to hospital employees regarding dealing with mental health patients," and "the hospital policy requiring patients to change into scrubs before going to PES" were all "to a reasonable degree of medical certainty, . . . consistent with the community standard of care." Powers Decl. ¶¶ 5-8.

This evidence establishes that: (1) the care and treatment provided to plaintiff by defendants while she was in the ED and PES unit was appropriate and within the applicable standard of care; (2) SCMC's policies requiring plaintiff to change into hospital scrubs, with the use of restraint if necessary, upon her admittance to the PES unit was appropriate and within the applicable standard of care; and (3) the training provided by SCMC to its employees regarding managing mentally ill patients was appropriate and within

Page 18 - OPINION AND ORDER

the applicable standard of care.  This evidence also reveals that Palmer was not responsible for, nor did he participate in, plaintiff's forcible change into hospital scrubs.

Plaintiff neglected to provide any relevant evidence in response to defendants' expert opinions.  In fact, the only opinion evidence that plaintiff provided was her own declaration, as well as the declaration of Andrew Renouf, Ph.D.  It is undisputed that plaintiff is not a medical expert; as a result, she cannot create a question of fact by submitting her own testimony.  See Hutchinson v. United States, 838 F.2d 390, 392-93 (9th Cir. 1988).  In addition, much of the information contained in plaintiff's declaration is immaterial.  See, e.g., Frank Decl. ¶¶ 1-11 (discussing her prior mental health hospitalizations in different states).  Further, plaintiff's declaration does not discuss several keys facts, including the events that precipitated defendants' actions.  See generally id.  For these reasons, plaintiff's testimony is not sufficient to create a genuine issue of fact.

Dr. Renouf's declaration also fails to raise a genuine issue of material fact.  Dr. Renouf is a psychologist from California. See Renouf Decl. ¶¶ 2-4 & Ex. 1.  Accordingly, he is not qualified to testify about whether an ED physician's actions conformed with the relevant standard of care in Bend, Oregon; seeming to acknowledge this, Dr. Renouf does not address the standard of care. Rather, he states only that plaintiff suffered emotional distress as a result of the events that took place on January 13, 2010.  Id.

Page 19 - OPINION AND ORDER

at ¶ 6.   Even assuming that he is qualified to render an expert opinion regarding causation, there is no indication that Dr. Renouf reviewed any of the evidence pertinent to this case.   See Supplemental Ex. C to Pl.'s Second Mot. Partial Summ. J. at 1 (stipulating that the only evidence Dr. Renouf reviewed in making his assessment, outside of his examination of plaintiff, was a psychiatric evaluation performed in 2005 and plaintiff's subjective reporting of events).   As such, the Court questions the basis of Dr. Renouf's opinion.   See, e.g., Clark v. Am. Nat'l Red Cross, 2006 WL 696256, *3 (D.Or. Mar. 16, 2006) (rejecting medical expert opinion evidence based solely on plaintiff's statements, which were unsupported by the record).   In any event, this testimony is inadequate to create a genuine issue of material fact regarding whether Palmer's or Timms' care fell below the applicable standard of care and whether any alleged breach of that standard resulted in harm to plaintiff.[7]

Finally, the Court finds that COEP's contract with SCMC does not alter the common law standard of care.   Even assuming that plaintiff could impose tort liability on Palmer based on a contract

---

[7] Plaintiff asserts for the first time in her response to SCMC's and Timms' joint motion for summary judgement that Dr. Renouf is "expected" to "testify that the employees and agents should have been aware that performing a forced opposite gender strip search on an individual with Plaintiff's history of sexual abuse would place her at a great risk for psychological harm." Pl.'s Opp'n to SCMC's & Timms' Mot. Summ. J. 13.   This assertion is insufficient to create a genuine issue of material fact for the reasons discussed above.

to which she is not a party, the provision on which she relies expressly incorporates the common law standard of care. See Pl.'s Reply to First Mot. Partial Summ. J. Ex. D (physicians "shall [r]ender Services which are consistent with ususal and customary medical community standards"); see also Buoy v. Soo Hee Kim, 232 Or.App. 189, 204, 221 P.3d 771 (2009) ("a breach of contract does not establish liability in tort") (citation omitted). As discussed above, defendants provided evidence that their care and policies met this standard, which plaintiff failed to refute.    Further, while Palmer concedes that he was unaware of their terms, there is no evidence in the record that he violated SCMC's polices.

    In sum, where, as here, a plaintiff fails to present opposing expert opinion evidence indicating that medical providers were negligent, "[i]t must . . . be taken as undisputed that the treatment was consistent with the requisite standard of care." Tiedemann, 299 Or. at 245.   In other words, plaintiff's failure to provide medical opinion evidence regarding the standard of care and causation is determinative at this stage in the proceedings. See, e.g., Swanson, 2009 WL 5149265 at *5 (citing Celotex, 477 U.S. at 324).  Therefore, Palmer's and Timms' motions for summary judgment are granted, and plaintiff's motions are denied, as to this claim.

        ii.  Negligence Per Se

    To establish a negligence per se claim, plaintiff must prove that: (1) "defendants violated a statute or rule"; (2) "plaintiff was injured as a result of that violation"; (3) "plaintiff was a

Page 21 - OPINION AND ORDER

member of the class of persons meant to be protected by the statute or rule"; and (4) "the injury plaintiff suffered is of a type that the statute or rule was enacted to prevent." <u>Buoy</u>, 232 Or.App. at 204 (citing <u>McAlpine</u>, 131 Or.App. at 144). "Strictly speaking, the doctrine of 'negligence per se' does not create a cause of action . . . it refers to a standard of care that a law imposes within a cause of action for negligence." <u>Gattman v. Favro</u>, 306 Or. 11, 15 n.3, 757 P.2d 402 (1988).

Additional limitations apply, however, when the application of negligence per se is based on a violation of an administrative regulation, rather than a statute. <u>See</u> <u>Barringer</u>, 2010 WL 5349206 at *11. First, "the regulation must, in fact, support a private right of action under the four-part test prescribed in <u>McAlpine</u>." <u>Id.</u> (citation omitted). Second, "even if the regulation meets the factors set forth in <u>McAlpine</u>, its terms permitting the imposition of private liability must not be ultra vires." <u>Id.</u> (citation omitted).

Here, plaintiff's negligence per se claim is based on a number of sources: Or. Rev. Stat. §§ 426.005 through 426.390; Oregon Administrative Rules ("OAR") 309-033-0200 through 309-033-0800; the Joint Commission on Accreditation of Health Care Organizations' ("JCAHO") guidelines;[8] and SCMC's policies. <u>See</u> Pl.'s Second Mot.

---

[8] JCAHO is a private corporation that creates guidelines for the quality of services in hospitals. Membership is voluntary; although SCMC is JCAHO accredited, many hospitals are not. <u>See</u> SCMC's Resp. to Pl.'s Second Mot. Summ. J. 8.

Page 22 - OPINION AND ORDER

Partial Summ. J. 12-17; Pl.'s Mem. in Supp. of First Mot. Partial

Summ. J. 9-20; Pl.'s Reply to First Mot. Partial Summ. J. 17.

a.    <u>Negligence   Per   Se   Based   on   Policies,</u>
<u>Procedures, or Guidelines</u>

SCMC's policies and JCAHO's guidelines are insufficient to fix

the legal standard of conduct and create a civil cause of action

under Oregon law; in fact, the parties have not cited to, and the

Court is not aware of, any precedent that has permitted a

negligence per se claim to proceed based on anything other than a

statute or regulation.[9]  <u>See</u> <u>Barringer</u>, 2010 WL 5349206 at *11

(negligence per se claim cannot be based on county's internal

policies); <u>see also</u> <u>Kadlec Med. Cnty. v. Lakeview Anesthesia</u>

<u>Assocs.</u>, 2006 WL 1328872, *2 (E.D.La. May 9, 2006) (as amended)

("JCAHO guidelines do not provide a negligence cause of action").

Moreover, even if these sources were a proper basis for a

negligence per se claim, based on the record before the Court,

plaintiff does not raise a genuine issue of material fact as to

defendants' reasonable adherence to the SCMC policies and

procedures outlined in section I.

b.    <u>Negligence Per Se Based on Statute</u>

Chapter 426 of the Oregon Revised Statutes includes a number

---

[9] Plaintiff's briefs invoke numerous documents, promulgated
by a variety of sources; it is difficult to decipher whether her
negligence per se claim was intended to encompass these other
sources as well.  Nonetheless, for the reasons stated above,
plaintiff's negligence per se claim fails to the extent it is
based on any source beyond a statute or OAR.

of laws concerning the commitment and treatment of persons with mental illness. Nonetheless, the Court finds that only Or. Rev. Stat. §§ 426.072, 426.231, and 426.232 are potentially applicable to this claim. Of these statutes, however, only Or. Rev. Stat. § 426.072 relates to the standard of care:

> All methods of treatment, including the prescription and administration of drugs, shall be the sole responsibility of the treating physician. However, the person shall not be subject to electroshock therapy or unduly hazardous treatment and shall receive usual and customary treatment in accordance with medical standards in the community.

Or. Rev. Stat. § 426.072(c)(2).

Plaintiff argues that the inclusion of the word "administration" in the statute requires Palmer to personally provide medication to every patient. Plaintiff also asserts that the medications prescribed to her by Palmer constitute "unduly hazardous treatment" within the meaning of the statute. In addition, plaintiff contends that the "use of the word 'and' in ORS 426.072(c) is a clear indicator that the usual and customary treatment of patients in accordance with medical standards in the community is in 'addition to' the mandates and duties outlined in the statute and rules." Pl.'s Reply to First Mot. Partial Summ. J. 12.

As an initial matter, plaintiff failed to provide any authority for her assertion that the medications prescribed to her qualify as "unduly hazardous treatment"; in any event, these medications cannot be characterized as such. See Nash v. Lewis

Page 24 – OPINION AND ORDER

("Nash I"), 2007 WL 2027283, *2 (D.Or. July 6, 2007). While the phrase "hazardous treatment" is not defined by statute or OAR, it is referenced only in the context of electroshock therapy. See, e.g., Or. Rev. Stat. § 426.072(c)(2); OAR 309-033-0625(4)(b). It is undisputed, however, that electroshock therapy, or any other analogous treatment, did not occur in this case. Further, the Court notes that plaintiff complains in other portions of her pleadings that defendants never "offered a tablet form of any anti anxiety medication," suggesting that the particular medications prescribed were not, in-and-of-themselves, "hazardous." Frank Decl. ¶ 20; see also Pl.'s Mem. in Supp. of First Mot. Partial Summ. J. 4-5 (conceding that the medical necessity of the prescribed medications); Pl.'s Reply to First Mot. Partial Summ. J. 2-3 ("Plaintiff does not dispute that Palmer order medications of appropriate dosage and timing for someone requiring immediate chemical restraint").

Moreover, aside from precluding "unduly hazardous treatments," the statute expressly incorporates the common law standard of care. See Tiedemann, 299 Or. at 248. A statute establishes the standard of care if it "so fixes the legal standard of conduct that there is no question of due care left for a factfinder to determine." Shahtout v. Emco Garbage, Co., 298 Or. 598, 601, 695 P.2d 897 (1985). Beyond stating that the treating physician shall be solely responsible for all methods of treatment in accordance with the usual and customary medical standards in the community, the statute
Page 25 - OPINION AND ORDER

does not explicitly outline any other duties. See Or. Rev. Stat. § 426.072. This language, however, leaves the question of due care to the factfinder. Further, as discussed above, Timms and Palmer provided uncontroverted evidence that they complied with the common law standard of care. Accordingly, on the record before the Court, plaintiff cannot sustain a negligence per se claim based upon Or. Rev. Stat. § 426.072(c)(2).

Finally, even construing the first sentence of this provision as imposing a separate and definable standard of care, plaintiff's claim still fails. While "administration" is not defined within Chapter 426 of the Oregon Revised Statutes or the implementing administrative rules,[10] it plainly means "the management of affairs." Webster's II New Riverside University Dictionary 79 (2d ed. 1988); see also Webster's Third New International Dictionary 28 (1st ed. 1971) (defining "administration" as "the act of administering . . . performance or execution of duties: MANAGEMENT, DIRECTION, SUPERINTENDENCE"); The Oxford English Dictionary, Vol. I 163 (2d ed. 2001) (defining "administration" as "the act of

_____

[10] Plaintiff's reliance on the Oregon Uniform Controlled Substances Act's definition of "administration" and "administer" is unpersuasive. This statute is inapplicable to the present dispute, as it governs an entirely different area of law. For instance, under this statute "administration" is defined as "the Drug Enforcement Administration of the United States Department of Justice, or its successor agency." Or. Rev. Stat. § 475.005(3). To the extent that this statute is arguably germane, it supports the above construction. See Or. Rev. Stat. § 426.005(2) ("Administer means the direct application of a controlled substance . . . to the body of a patient or research subject by [a] practitioner or an authorized agent thereof").

Page 26 - OPINION AND ORDER

administering . . . management"). The Court also finds the definition of "administer" and "administering" to be instructive in this instance, which are defined respectively as "to have charge of: MANAGE . . . .to manage as an administrator" and "managing." Webster's II New Riverside University Dictionary 79 (2d ed. 1988); see also Webster's Third New International Dictionary 27-28 (1st ed. 1971); The Oxford English Dictionary, Vol. I 163 (2d ed. 2001). The context of the statutory scheme at issue supports this interpretation. See generally OAR 309-033-0200 et seq.; Or. Rev. Stat. Chapter 426.

Thus, this statute must be conspicuously read as imposing a duty on Palmer to oversee plaintiff's care, not to personally conduct every modality of treatment.[11] In other words, Palmer neither violated the statute nor was otherwise negligent simply by delegating certain facets of plaintiff's treatment to other qualified hospital staff.

  c.   Negligence Per Se Based on Administrative Rule

OAR 309-033-0200 through 309-033-0800 are the implementing regulations for Chapter 426 of the Oregon Revised Statutes and specifically govern involuntary commitment proceedings. See OAR

_____

[11] Ordinarily, examination of the legislative history would supplement this Court's interpretation of Or. Rev. Stat. § 426.072. See State v. Gaines, 346 Or. 160, 171-72, 206 P.3d 1042 (2009) (describing the legal framework for statutory interpretation). Here, however, the parties did not brief this issue and, accordingly, did not provide any information or make any arguments regarding the legislative history. Regardless, the Court finds the dictionary definition to be sufficient.

Page 27 - OPINION AND ORDER

309-033-0200(1).   While plaintiff argues broadly that defendants violated all of these regulations, her briefs only refer to OAR 309-033-0625, which regulates the treatment of committed persons without informed consent.   As such, these regulations are inapplicable here because it is undisputed that plaintiff "was not a person 'committed' as opposed to a person in custody pursuant to an ORS 426.232 hospital hold."   Nash I, 2007 WL 2027283 at *1 (citations omitted); see also Pl.'s Mem. in Supp. of First Mot. Partial Summ. J. 17 (acknowledging that "Plaintiff was not a legally committed person").   For this reason alone, plaintiff's claim fails.

Even assuming, however, that OAR 309-033-0625 does apply in this case, plaintiff failed to brief, let alone establish, that all the elements of a negligence per se claim are fulfilled and, further, that its terms permitting the imposition of private liability are not ultra vires.   For this additional reason, plaintiff's claim fails.

Finally, contrary to plaintiff's assertions, the inclusion of the word "administer" in this OAR does not obligate Palmer to personally inject plaintiff with medication.   See OAR 309-033-0625(1), (4)(a) (the treating physician "shall [a]dminister medication and treatment in accordance with medical standards in the community").[12]   As discussed above, this language merely

_____

[12] This subsection imposes a number of additional requirements on the treating physician when administering

Page 28 - OPINION AND ORDER

requires the treating physician to manage a patient's medication and treatment in accordance with the common law standard of care, which undisputedly occurred in this case.  See generally Palmer Aff.  Moreover, this statute clearly authorizes the administration of significant procedures, including medication, without informed consent where an emergency exists.  See OAR 309-033-0625(3); see also OAR 309-033-0625(4)(f).

Here, defendants submitted uncontradicted evidence that such an emergency existed and that the use of the prescribed medications was medically necessary in order to prevent plaintiff from harming herself or others.  See generally Palmer Aff.; Timms Decl.; see also OAR 309-033-0625(3) (defining "emergency").  Thus, even assuming that OAR 309-033-0625 is applicable and sets forth a sufficiently specific standard of care, plaintiff failed to demonstrate that defendants violated this rule.  Therefore, to the extent that plaintiff asserts a negligence per se or statutory negligence claim, Timms' and Palmer's motions are granted, and plaintiff's motion is denied.

B.  IIED, NIED, and RIED Claims Against SCMC, Palmer, Timms, Namanny, Macdonnell, Ryan, Violet, Huffman, Lancaster, Mcbride, Beutler, and Nelson

Plaintiff's NIED, RIED, and IIED claims are based on the same

---

significant procedures without informed consent to involuntarily committed persons.  See OAR 309-033-0625(4)(b)-(g).  Plaintiff, however, has not set forth facts, let alone any evidence, indicating that these provisions were implicated or violated.

facts and arguments as her negligence claim. See TAC ¶¶ 58-64. As such, plaintiff contends that defendants' failure to provide accommodations to their disrobing policy based on plaintiff's history of abuse constituted socially intolerable behavior.

A preliminary matter must be addressed before reaching the merits of plaintiff's emotional distress claims. On August 27, 2012, pursuant to the conferral process, plaintiff agreed to dismiss her claims for RIED and IIED. See O'Kasey Decl. in Supp. of Palmer's Supplemental Mot. Summ. J. ¶ 2. On September 21, 2012, plaintiff filed her TAC, which includes REID, IIED, and NIED claims. On October 26, 2012, plaintiff informed defendants that she was withdrawing her earlier dismissals. Id. at ¶ 4 & Ex. 1. Plaintiff's failure to abide by her own statements during the conferral process, especially in the light of defendants' significant expenditure of time and resources litigating this case due in part to plaintiff's conduct, is reason alone to dismiss her IIED and RIED claims. Nevertheless, because she is proceeding pro se, the Court will briefly address plaintiff's IIED and REID claims.

i.   IIED Claim

To prevail on an IIED claim, a plaintiff must show that: (1) defendants "intended to cause plaintiff severe emotional distress or knew with substantial certainty that their conduct would cause such distress"; (2) defendants "engaged in outrageous conduct, i.e., conduct extraordinarily beyond the bounds of socially

Page 30 - OPINION AND ORDER

tolerable behavior"; and (3) such "conduct in fact caused plaintiff severe emotional distress." House v. Hicks, 218 Or.App. 348, 357-58, 179 P.3d 730, rev. denied, 345 Or. 381, 195 P.3d 911 (2008) (citation omitted).  In regard to the second element, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. at 358 (citation and internal quotations omitted).  The determination of whether conduct rises to this level "is a fact-specific inquiry, to be considered on a case-by-case basis, based on the totality of the circumstances." Id.  While "the inquiry is fact-specific, the question of whether the defendant's conduct exceeded the farthest reaches of socially tolerable behavior is, initially, a question of law" for the court.  Gordon v. Kleinfelder W., Inc., 2012 WL 844200, *14 (D.Or. Mar. 12, 2012) (citation and internal quotations omitted).

As such, on summary judgment, a court must first assess whether defendants' conduct is sufficiently "extreme and outrageous" to state an IIED claim.  Id.  Here, defendants' conduct, while clearly upsetting to plaintiff, simply cannot be categorized as atrocious, utterly intolerable, or beyond all possible bounds of decency.  As discussed above, defendants provided ample, uncontradicted evidence that their intent in using restraint to effectuate SCMC's polies was to ensure plaintiff's safety and well-being, as well as the safety and well-being of

Page 31 - OPINION AND ORDER

hospital staff.  See generally Palmer Aff.; Timms Decl.; Ryan
Decl.; Powers Decl.; Beutler Decl.  It is also undisputed that
defendants gave plaintiff several opportunities to change into
hospital scrubs of her own accord and informed her of SCMC's
policy.  Only after plaintiff became combative and threw the scrubs
at hospital staff was restraint employed.  See Ryan Decl. ¶ 6.
Further, defendants used reasonable means to ensure that
plaintiff's privacy was intruded upon as little as possible;
notably, the men in the room averted their eyes and did not
participate in the actual disrobing, skin check, or redressing.
Id. at ¶ 8; see also Pl.'s Mem. in Supp. of Opp'n to Palmer's Mot.
Summ. J. Ex. 4, at 3-4 (Macdonnell and Namanny "assisted SCMC staff
with this process [of changing plaintiff into hospital scrubs], and
all of the men present made every effort to look away while Frank
was in a state of undress").  In addition, defendants provided
evidence that medications of the type and quantity administered
were reasonably necessary under the circumstances to protect
plaintiff's health and safety.  See generally Timms Decl.; Palmer
Aff.

     In sum, the record before the Court reveals that defendants'
actions were aimed at helping, rather than harming, plaintiff.
That such assistance may have been rendered clumsily, of which the
Court offers no opinion, is inadequate for the purposes of
plaintiff's IIED claim.  Accordingly, the Court finds that, as a
matter of law, defendants' conduct cannot reasonably be regarded as

so extreme and outrageous as to permit recovery. Therefore, defendants' motions are granted as to plaintiff's IIED claim.

    ii. <u>NIED Claim</u>

    Under Oregon law, emotional distress damages generally are not recoverable under a negligence theory; however, a plaintiff can recover "'for emotional distress caused by ordinary negligence, but only if the distress is accompanied by physical impact.'"  <u>See Dauven v. George Fox Univ.</u>, 2011 WL 901026, *2-3 (D.Or. Mar. 15, 2011) (quoting <u>Lowe v. Philip Morris USA, Inc.</u>, 207 Or.App. 532, 551, 142 P.3d 1079 (2006), <u>aff'd</u>, 344 Or. 403, 183 P.3d 181 (2008)).  In other words, in order to prevail on a NIED claim, a plaintiff must prove that she suffered a physical injury, which in turn caused emotional distress, as a result of defendants' negligence. <u>See</u> <u>Chouinard</u>, 179 Or.App. at 512.  In certain limited circumstances, however, a plaintiff may recover for NIED, even in the absence of a physical injury, where the defendant's actions breached a "specific duty to be aware of and guard against particular adverse psychological reactions or consequences to medical procedures." <u>Curtis v. MRI Imaging Servs.</u>, 327 Or. 9, 14-15, 956 P.2d 960 (1988).

    As discussed in section I(A)(I), defendants provided unrefuted evidence that their care, as well as SCMC's policies and training, met the common law standard of care.  Because defendants' evidence demonstrates that they were not negligent, plaintiff's NIED claim, which is contingent upon a finding of negligence, fails as a matter

Page 33 - OPINION AND ORDER

of law.  See, e.g., Chouinard, 179 Or.App. at 511-15 (NIED claim only viable where it was undisputed that the defendants' conduct fell below the applicable standard of care).

Moreover, plaintiff did not establish the existence of a physical injury, which is a threshold requirement.  While neither the Oregon Supreme Court nor the Oregon Court of Appeals "have sought to define the minimum amount of bodily harm necessary to constitute a physical impact" in the context of a NIED claim, it is well-settled that "some form of physical injury" or "offensive sexual touching" is a prerequisite to recovery.  Id. at 514-15 (citations omitted).  Accordingly, "[a]t a minimum, the physical impact rule requires an act or omission that results in some perceptible physical effect on a plaintiff."  Id. at 515 (citations omitted).

Here, plaintiff alleges that she was "molested"; in addition, she asserts that she suffered jaw pain for a few weeks following the events at issue.  See TAC ¶¶ 2, 64.  Beyond so concluding, plaintiff has put forth no facts or evidence indicating that the physical restraint employed to effectuate her change into hospital scrubs was sexual in nature.  To the contrary, the evidence in the record indicates that defendants used reasonable means to ensure that plaintiff's bodily integrity and privacy remained intact.  See Ryan Decl. ¶ 8; see also Pl.'s Mem. in Supp. of Opp'n to Palmer's Mot. Summ. J. Ex. 4, at 3-4.  Thus, while plaintiff may have found defendants' use of restraint and disrobing to be offensive, any

Page 34 - OPINION AND ORDER

contact with plaintiff's breasts, buttocks, or genitals was neither intentional nor sexually motivated.  See Panasewich v. Dayton Hudson Corp., 1999 WL 446884, *10 (D.Or. Apr. 28, 1999) ("substantial nonconsensual sexual touching," involving an element of intent, is required to sustain a NIED claim, citing Shoemaker v. Mgmt. Recruiters Internat'l, 125 Or.App. 568, 573-74, 865 P.2d 1331 (1993); and Wilson v. Tobiassen, 97 Or.App. 527, 532, 777 P.2d 1379, rev. denied, 308 Or. 500, 784 P.2d 441 (1989)).  Further, while not dispositive, the Court notes that the entire situation could have been avoided had plaintiff merely complied with SCMC's policies of her own volition.

In addition, plaintiff did not proffer any evidence that she suffered a jaw injury or any damages as a result of that injury. Critically, she also does not argue that this jaw pain caused the emotional distress she endured as the result of defendants' allegedly negligent treatment.  See Pl.'s Resp. in Opp'n to Palmer's Supplemental Mot. Summ. J. 10; Pl.'s Resp. in Opp'n to SCMC's Mot. Summ. J. 19-20.  As such, without now defining the scope of the physical impact rule, the Court finds that, on the facts and evidence of this case, these instances of physical contact or pain are not sufficient to sustain a NIED claim.

Lastly, a physician does not have a general duty to guard against emotional harm, even in the context of a patient-physician relationship.  See Curtis, 327 Or. at 15-16.  Thus, in order to prevail on a claim for emotional distress damages in a medical
Page 35 - OPINION AND ORDER

malpractice case that does not involve a physical injury, plaintiff must prove that there was a standard of care that included a duty to protect against psychiatric harm. See Navarette v. Nike, Inc., 2007 WL 221865, *4 (D.Or. Jan. 26, 2007), aff'd, 332 Fed.Appx. 405 (9th Cir. June 10, 2009) (citing Curtis, 327 Or. at 14-16; and Ratherberger v. James Hemengway, Inc., 176 Or.App. 135, 145, 30 P.3d 1200 (2001), aff'd, 335 Or. 404, 414, 69 P.3d 710 (2003)). As discussed above, plaintiff failed to identify a standard of care that contains a duty to protect against emotional distress; in fact, plaintiff's entire argument in favor of a heightened duty is based on the existence of a patient-physician relationship and her assertion that Timms and Palmer had knowledge of her past abuse. This is insufficient, especially in light of defendants' unrefuted expert opinion evidence. Simply put, plaintiff's unhappiness with SCMC's policies, and defendants' enforcement of those policies, cannot sustain a NIED claim. Accordingly, defendants' motions for summary judgment are granted on this claim and plaintiff's motion is denied.

### iii. RIED Claim

RIED claims are appropriate in three narrowly-drawn circumstances: (1) "when accompanied by physical injury"; (2) "when a defendant's conduct infringes on a legally protected interest"; and (3) "where there is a duty to protect against psychological harm." Dawson v. Entek Int'l, 662 F.Supp.2d 1277, 1292 (D.Or. 2009), rev'd on other grounds, 630 F.3d 928 (9th Cir. 2011)

Page 36 – OPINION AND ORDER

(citations omitted).  Plaintiff makes no argument and provides no evidence to show that the second circumstance applies in this case. Further, the Court finds that the first and third circumstances are not implicated here; as discussed in section II(B)(ii), plaintiff did not establish the existence of a physical injury or a heightened duty of care.   Therefore, defendants' motions are granted as to plaintiff's RIED claim.

C.   Negligence Claim Against SCMC

Plaintiff contends that SCMC was negligent by failing to: (1) "maintain the organization and operation of the [ED] within the [JCAHO] guidelines"; (2) "develop clear and well-defined policies and procedures relating to [ED personnel and services] as it relates to allegedly mentally ill persons brought [in] pursuant to ORS 426.228"; and (3) "eradicate the unwritten practice and custom of performing opposite gender strip searches of allegedly mentally ill patients."   Pl.'s Second Mot. Partial Summ. J. 4-5.   In addition, plaintiff asserts that SCMC is vicariously liable for the negligence of its agents.

Plaintiff's claim against SCMC is dismissed.  First, plaintiff concedes that SCMC "has implemented its work instruction policies to mirror the conditions of participation as outlined by [JCAHO]." Id. at 8.  As discussed above, however, while SCMC's policies and JCAHO's guidelines may be relevant to establishing a common law negligence claim, they are insufficient to fix the legal standard of conduct and create a civil cause of action for a negligence per

Page 37 - OPINION AND ORDER

se or statutory tort claim.

Further, it is undisputed that SCMC had policies and procedures in place that expressly authorized the use of restraint to change a PES Unit admittee out of their street clothes and into hospital scrubs. See generally Disrobing Policy, Restraint Policy, Search Policy, and Hold Procedure. Defendants provided expert testimony that the training provided to hospital employees dealing with mental health patients is appropriate and within the standard of care. See Powers Decl. ¶ 8. In addition, defendants set forth evidence establishing that their use of force in this case was not excessive or abusive. See Abel Decl. Ex. 2, at 2-6. Plaintiff did not provide any relevant evidence in support of her assertions to the contrary. Without more, plaintiff cannot demonstrate that SCMC was negligent for failing to have such a policy or for failing to adequately train its employees pursuant to that policy. See Swanson, 2009 WL 5149265 at *5; Tiedemann, 299 Or. at 243-49.

Moreover, plaintiff's assertion that SCMC's policies were deficient because they did not provide reasonable accommodations or alternatives to physical restraint for patients "who are reluctant to remove their clothing" is misguided. Pl.'s Second Mot. Partial Summ. J. 12; TAC ¶¶ 37-38. As discussed above, defendants provided evidence regarding the need for the Disrobing Policy, why accommodations are not allowed, and the reasonableness of this policy; defendants also provided evidence that plaintiff was presented with numerous opportunities to voluntarily change into

Page 38 - OPINION AND ORDER

hospital scrubs, even after being informed of SCMC's polices, and refused to do so. See generally Ryan Decl. Plaintiff once again failed to rebut this evidence. As a result, SCMC adequately established that having hospital policies in place that require all patients to change into scrubs, with the use of restraint if necessary, prior to being admitted to the PES unit is within the standard of care and is therefore not negligent.

Finally, where, as here, the agent is not negligent, there is no basis for a vicarious liability claim against the principal. See Allen v. Kaiser Found. Hosp., Inc., 76 Or.App. 5, 8, 707 P.2d 1289 (1985); Checkley v. Boyd, 198 Or.App. 116, 134 n.14, 107 P.3d 651, rev. denied, 338 Or. 583, 114 P.3d 505 (2005). Because plaintiff failed to provide a medical expert or other relevant evidence regarding the standard of care and causation, defendants' evidence as to these issues is dispositive. See Swanson, 2009 WL 5149265 at *5; Tiedemann, 299 Or. at 243-29. Defendants' evidence demonstrates that neither SCMC nor any of its employees or agents were negligent in enforcing the policies at issue or in providing medical care to plaintiff. Accordingly, there is no basis for SCMC to be vicariously liable. Therefore, SCMC's motion is granted and plaintiff's motion is denied.

D.    Negligence Claim Against COEP

Plaintiff also argues that COEP is liable "for the torts committed by its individual Physicians, including but not limited to Edward Palmer, MD for its negligence in failing to eradicate the

Page 39 - OPINION AND ORDER

unwritten unconstitutional opposite gender strip search policy which ultimately led to Plaintiff's injuries." Pl.'s Resp. to COEP's Mot. Summ. J. 3; see also TAC ¶¶ 88-91. Specifically, plaintiff contends that, pursuant to sections 1.5 and 1.7 of the contract between SCMC and COEP, COEP was responsible for educating Palmer and ensuring the quality of SCMC policies; COEP's alleged failure to do so violated the standard of care. Id.

Plaintiff's claim fails for two reasons. First, as discussed above, plaintiff failed to provide evidence that Palmer's treatment was not in accordance with the relevant community standards; in addition, there is nothing in SCMC's policies that was negligent. For this reason, COEP cannot be vicariously liable for Palmer's or SCMC's actions. See Allen, 76 Or.App. at 8-9; Checkley, 198 Or.App. at 134 n.14.

Second, contrary to plaintiff's assertion, the contract at issue does not grant COEP or any of its member physicians control over SCMC's policies. The provisions of that agreement cited by plaintiff are inapplicable: section 1.5 governs quality assurance and peer review policies, and section 1.7 governs the covered physicians' teaching requirements. See O'Kasey Decl. in Supp. of COEP's Mot. Summ. J. Ex. 1, at 3-4. In addition, the plain language of the contract specifies that neither COEP nor Palmer have control of SCMC's policies. Id. at 5 (COEP physicians are "at all times acting as independent contractors and . . . are not partners, joint-venturers or employees [and] will not for any

Page 40 - OPINION AND ORDER

purpose be deemed to be agents, ostensible or apparent agents, or servant of [SCMC]").

While plaintiff is correct that "[t]he parties' description of their legal relationship does not control the legal implications of their relationship," she neglects to introduce any relevant evidence beyond the contract that COEP or Palmer exercise any control over the manner, means, or result of SCMC's policy-making.[13] Pl.'s Resp. to COEP's Mot. Summ. J. 4 (citing Peeples v. Kawasake Heavy Indus., Ltd., 288 Or. 143, 150, 603 P.2d 765 (1979)); see also Soderback v. Townsend, 57 Or.App. 366, 369, 644 P.2d 640, rev. denied, 293 Or. 394, 650 P.2d 927 (1982) (discussing the difference between independent contractors and employees). In fact, the additional evidence that plaintiff relies on - SCMC's "Bylaws, Rules and Regulations" and "Plan for the Provision of Patient Care" - supports COEP's arguments in favor of summary judgment. See Pl.'s Opp'n to COEP's Mot. Summ. J. Exs. A-C.

In sum, SCMC enacted policies and procedures over which COEP or Palmer had no control. Accordingly, COEP's motion is granted and plaintiff's motion is denied as to this claim.

III. Federal Claims

Plaintiff's federal claims are asserted pursuant to 42 U.S.C.

---

[13] This is not to say that a hospital cannot be vicariously liable for the medical malpractice committed by a physician who is an independent contractor. See, e.g,. Themins v. Emanuel Lutheran Charity Bd., 54 Or. App. 901, 907-09, 637 P.3d 155, rev. denied, 292 Or. 568, 644 P.2d 1129 (1982).

Page 41 - OPINION AND ORDER

§ 1983.  To prevail on a claim under this statute, a plaintiff must demonstrate that: 1) the conduct complained of deprived him or her of an existing federal constitutional or statutory right; and 2) the conduct was committed by a state actor or a person acting under color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988); L.W. v. Grubbs, 974 F.2d 119, 120 (9th Cir. 1992), cert. denied, 508 U.S. 951 (1993).  In addition, where a plaintiff seeks to impose liability under 42 U.S.C. § 1983 against a municipality, he or she must also establish that a policy or custom existed that was the moving force behind the violation at issue.  See Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs., 237 F.3d 1101, 1110-11 (9th Cir. 2001) (citation omitted).

> A.    Fourteenth Amendment Claim Against the City, Namanny, and Macdonnell

Plaintiff contends that the individually named defendants and the City violated her Fourteenth Amendment rights because their conduct, which entailed "restraining plaintiff and forcibly stripping [her] out of her clothing" pursuant to SCMC's policies, was "unreasonable and/or arbitrary, deliberately indifferent and/or shocking to the conscience."  TAC ¶¶ 66-70.

It is undisputed that there is a federally recognized liberty interest in the right to bodily integrity under the Fourteenth Amendment.[14]   See Albright v. Oliver, 510 U.S. 266, 272 (1994)

---

[14] Plaintiff also asserts that defendants violated the Fourteenth Amendment's Equal Protection clause; however,

(citation omitted).    Further, it is undisputed that Namanny, Macdonnell, and the City qualify as state actors for the purposes of 42 U.S.C. § 1983.    Nevertheless, liability under this statute cannot be premised on a respondeat superior theory; accordingly, a municipality may only be held liable if the entity itself acted illegally through a policy or custom.  See Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 691 (1978); see also Mabe, 237 F.3d at 1110-11.  A policy is "a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  Fairley v. Luman, 281 F.3d 913, 918 (9th Cir.), cert. denied, 537 U.S. 1044 (2002) (citations and internal quotations omitted).    A custom is a "widespread practice that, although not authorized by written law or express municipal policy, is . . . permanent and well-settled."  City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988).

A policy or custom can be one of action or inaction.  See City of Canton v. Harris, 489 U.S. 378, 388 (1989).  To impose liability against a municipality for its inaction, "a plaintiff must show: (1) that a [municipal] employee violated the plaintiff's constitutional rights; (2) that the county has customs or policies that amount to deliberate indifference; and (3) that these customs

---

plaintiff failed to allege any facts, set forth any evidence, or make any arguments in regard to this claim.  As such, the Court declines to address it.

or policies were the moving force behind the employee's violation of constitutional rights." Long v. Cnty. of L.A., 442 F.3d 1178, 1186 (9th Cir. 2006) (citation omitted). "Deliberate indifference in this context requires proof that city policymakers disregarded the known or obvious consequence that a particular omission in their training program would cause city employees to violate citizens' constitutional rights." Connick v. Thompson, 131 S.Ct. 1350, 1354 (2011) (citation and internal quotations omitted). Further, a "pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference." Id. (citation omitted).

Plaintiff has not identified any facts indicating that the City or the Bend Police Department acted in an unlawful matter in this case. See generally TAC; Pl.'s Opp'n to City's Mot. Summ. J.; Pl.'s Mem. in Supp. of Opp'n to City's Mot. Summ. J. Moreover, it is undisputed that plaintiff did not allege the existence of a City policy or custom that was the moving force behind the constitutional violations at issue. See generally TAC; see also Pl.'s Resp. to City's Mot. Summ. J. 3 (conceding that she "did not allege any specific Policy of the City, which led to the deprivation of her Constitutional rights in her complaint").

In order to cure these deficiencies, plaintiff attempts to establish the existence of such a policy or custom in her response brief, asserting that defendants "were deliberately indifferent to Plaintiff's Constitutional rights and that she suffered an injury

Page 44 - OPINION AND ORDER

because of a policy, custom, or practice involving the police officers and the hospital employees." Pl.'s Opp'n to City's Mot. Summ. J. 4; see also Pl.'s Mem. in Supp. of Opp'n to City's Mot. Summ. J. 8-10.   Specifically, plaintiff asserts that she "was deprived of her Constitutional rights when she was taken into custody due to a municipal policy of treating mentally ill persons like prisoners." Pl.'s Mem. in Supp. of Opp'n to City's Mot. Summ. J. 6.   Plaintiff also contends that a Bend Police Department policy, "Dealing with the Mentally Ill III," is "unconstitutional and discriminatory on its face" because "it portrays all mentally ill persons as violent or having a propensity for violence." Pl.'s Opp'n to City's Mot. Summ. J. 4-5.

Aside from the fact that her TAC does not actually contain any such allegations, the City provided rebuttal testimony from the Bend Chief of Police:

> When taking a person into custody on a police officer mental hold, it was always the policy, practice, and custom of the City of Bend Police Department to have its police officers follow the state law provisions in relation to police officer mental holds, and to follow any requirements of the Fourth and Fourteenth Amendments . . . There has never been a policy, practice, or custom of the City of Bend Police Department to promote or encourage its police officers acting in a hospital setting to violate the civil rights of a person that has been taken into custody on a police officer mental hold.

Baxter Decl. 1-2.   The Court finds this evidence sufficient to establish that the City did not have a policy or custom, of action or inaction, that was the moving force behind the alleged violation of plaintiff's constitutional rights.   Plaintiff failed to provide

Page 45 - OPINION AND ORDER

any evidence in response and, accordingly, the City is entitled to summary judgment. See Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1107 (9th Cir. 2000) (once the moving party carries its initial burden of production, "the nonmoving parties were obligated to produce evidence in response"). Due to her pro se status, however, the Court will discuss briefly additional reasons why plaintiff's arguments fail.

Notably, plaintiff does not explain how "Dealing with the Mentally Ill III" was a moving force behind the alleged constitutional violations at issue; she only concludes that it "led to Plaintiff's mistreatment" because it negatively depicts the mentally ill. Pl.'s Opp'n to City's Mot. Summ. J. 6. Critically, she does not address how this policy caused the restraint of her liberty. Further, the plain language of this policy merely provides information concerning how to identify a potentially mentally ill individual and counsels officers to exercise caution. See Pl.'s Opp'n to City's Mot. Summ. J. Attach. 1. The fact that it could have been better worded is insufficient to raise a claim under 42 U.S.C. § 1983.

Plaintiff's arguments regarding defendants' "deliberate indifference" are similarly unavailing. Here, even assuming that plaintiff's rights were violated, there is no evidence that the City disregarded a known or obvious consequence in training its employees concerning the mentally ill, or exhibited a pattern of similar constitutional violations. In fact, plaintiff has not

Page 46 - OPINION AND ORDER

identified any facts or set forth any evidence regarding the Bend Police Department's training program, which, in this context, is critical to a deliberate indifference claim. See City of Canton, 489 U.S. at 390-91 ("the focus must be on the adequacy of the training program . . . that a particular officer may be unsatisfactorily trained" or that an injury could have been avoided with "better or more training" will "not alone suffice to fasten liability on the city"). In addition, Oregon law expressly allows a police officer to "take into custody a person who the officer has probable cause to believe is dangerous to self or to any other person and is in need of immediate care . . . for mental illness [and] remove [him or her] to the nearest hospital." Or. Rev. Stat. § 426.228. Thus, contrary to plaintiff's assertion, she was not taken into custody pursuant to a City policy or custom; rather, plaintiff was taken into custody under Oregon law and it is undisputed that defendants had probable cause for their actions.

Further, plaintiff has not set forth any facts or evidence indicating that defendants knew or should have known that their attendance would cause plaintiff harm, which is a requisite element. See Henry A. v. Willden, 678 F.3d 991, 1001 (9th Cir. 2012). The record demonstrates that, when Namanny arrived on the scene of plaintiff's suicide attempt, he interviewed her, identified her need for mental health treatment, and took her to SCMC. After observing her belligerent and threatening behavior on numerous occasions on the evening in question, Namanny assisted

Page 47 - OPINION AND ORDER

SCMC staff and Macdonnell in restraining plaintiff, so that she would not harm herself or others, while she was changed into hospital scrubs pursuant to hospital policy.    There is no allegation or evidence that defendants were subjectively aware of plaintiff's past sexual abuse or that they exerted excessive force in restraining her.    Accordingly, to the extent that plaintiff suffered psychological distress as the result of being forcibly undressed in the presence of male police officers, such an injury was not reasonably foreseeable by Namanny, Macdonnell, or the City.

Moreover, the Court rejects plaintiff's assertion that, because "the government's interest ends at transporting the patient to the hospital," the City should be liable for neglecting to develop policies that require the police to abandon a mentally ill person instantly upon his or her admittance to SCMC. Pl.'s Mem. in Supp. of Opp'n to City's Mot. Summ. J. 9.    Plaintiff's claimed right – to be free from the presence of officers upon walking into the hospital, after making repeated suicidal gestures and while severely intoxicated – is markedly different from those previously recognized under the Fourteenth Amendment.    See Albright, 510 U.S. at 272 (noting that the protections of substantive due process have been limited to "matters relating to marriage, family, procreation, and the right to bodily integrity").    Plaintiff has not cited to, and this Court is not aware of, any authority that holds, either directly or by analogy, that the Due Process Clause protects such an interest.    Therefore, this Court declines to recognize a

Page 48 - OPINION AND ORDER

substantive due process interest in the right to be free from police officers immediately after being taken to the hospital pursuant to Or. Rev. Stat. § 426.228.

Lastly, to the extent that plaintiff asserts that the City can be liable based on SCMC's Disrobing Policy, Restraint Policy, and Hold Procedure, which "promote if not encourage police action in the hospital setting for patients seeking mental health care," her claim also fails.   Pl.'s Opp'n to City's Mot. Summ. J. 3. Plaintiff has not cited to, and the Court is not aware of, any precedent that authorizes the imposition of liability on a municipality based on the existence of a separate, private corporation's policies.   In any event, the Court declines to do so here.   Thus, the City's motion is granted as to this claim.

B.   Fourteenth Amendment Claim Against SCMC, Palmer, Timms, Ryan, Violet, Huffman, Lancaster, Mcbride, Beutler, Nelson, Namanny, and Macdonnell

Next, plaintiff contends that defendants violated her Fourteenth Amendment rights by "repeated physical restraint and the administering of involuntary medications."   TAC ¶¶ 80-82.   As discussed above, there there is a federally recognized liberty interest in the right to bodily integrity under the Fourteenth Amendment; further, neither Namanny and Macdonnell nor plaintiff moved for summary judgment on these claims and it is undisputed that the remaining defendants are not state actors.   Accordingly, this claim turns on whether SCMC, Palmer, Timms, Ryan, Violet,

Page 49 - OPINION AND ORDER

Huffman, Lancaster, Mcbride, Beutler, and Nelson were acting under color of state law.

Generally, only a state actor, and not a private individual or entity, may be liable under 42 U.S.C. § 1983 because it "excludes from its reach merely private conduct, no matter how discriminatory or wrong." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999) (citation and internal quotations omitted); Sutton v. Providence St. Joseph Med. Ctr., 192 F.3d 826, 835 (9th Cir. 1999). In other words, there is no right to be free from the infliction of constitutional deprivations by private parties. Nevertheless, "a § 1983 action can lie against a private party when he is a willful participant in joint action with the State or its agents." Kirtley v. Rainey, 326 F.3d 1088, 1092 (9th Cir. 2003) (citation and internal quotations omitted). The ultimate issue in determining if a party is subject to suit under this statute is whether "the alleged infringement of federal rights [is] fairly attributable to the government." Id. (citations omitted). While "[w]hat is fairly attributable as state action is a matter of normative judgment," courts employ "four different criteria" to identify state action: (1) public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus. Id. (citations and internal quotations omitted). Satisfaction of any one test is generally sufficient to establish state action. Id.

As an initial matter, there are no specific assertions in

Page 50 - OPINION AND ORDER

plaintiff's complaint or briefs regarding which of these defendants participated in changing her into scrubs or medicating her. Thus, with the exception of Ryan, who provided testimony about his involvement, it is unclear what role, if any, the remaining individually named defendants played in the challenged conduct. Regardless, defendants argue that none of these tests are fulfilled here because SCMC is a private hospital and its employees, as well as Palmer, are private citizens; accordingly, any actions taken by SCMC, its staff, or Palmer were not done on behalf of or in conjunction with the state.

Plaintiff does not address any of these specific tests in her motions or briefs. While difficult to decipher, the crux of her argument is that defendants were engaged in state action because "there is an apparent custom or practice between SCMC [ED] staff and the City . . . which was a somewhat controlling factor in the incident that of which Plaintiff complains." Pl.'s Mem. in Supp. of Second Mot. Partial Summ. J. 13. In addition, plaintiff argues that, because SCMC is an "approved healthcare facility" under Or. Rev. Stat. § 426.005(d) and defendants were acting pursuant to state law in placing a mental health hold, they were acting under color of state law. See TAC ¶¶ 81-83. Plaintiff, however, does not provide any evidence in support of her assertion that defendants were acting under color of state law for the purposes of a 42 U.S.C. § 1983 claim.

Page 51 - OPINION AND ORDER

i.  <u>Public Function Test</u>

"Under the public function test, when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." <u>Kirtley</u>, 326 F.3d at 1093 (citation omitted).  This test is met only upon a showing that the function at issue is "both traditionally and exclusively governmental." <u>Id.</u> Here, a private hospital and its employees, as well as a physician who provides services to that hospital on a contract basis, function to provide medical assistance to the adjoining community.  The parties have not cited to, and the Court is not aware of, any authority that holds that this function is traditionally or exclusively governmental; SCMC's designation as a "facility" within the meaning of Or. Rev. Stat. § 426.005(d), and plaintiff's placement on a mental health hold pursuant to Oregon law, does not alter the fact that providing medical treatment is not solely the responsibility of the government. <u>See</u> <u>Chasse v. Humphreys</u>, 2009 WL 3334912, *5-6 (D.Or. Oct. 13, 2009) (provision of emergency medical services by a private company and its medical staff pursuant to Oregon law was neither a traditionally nor exclusively governmental function); <u>see also</u> <u>Schneck v. Yamamoto</u>, 2011 WL 4595013, *2 (E.D.Cal. Feb. 24, 2011), <u>aff'd</u>, 475 Fed.Appx. 256 (9th Cir. 2012) (non-profit hospital that provided public services was performing a government function) (citations omitted).  Accordingly, the public function

Page 52 – OPINION AND ORDER

test has no application in this case.

    ii.  <u>Joint Action Test</u>

Under the joint action test, the court examines whether "the state has so far insinuated itself into a position of interdependence with the private entity that it must be recognized as a joint participant in the challenged activity." <u>Kirtley</u>, 326 F.3d at 1093 (citation omitted). As such, this test is met "when the state knowingly accepts the benefits derived from unconstitutional behavior." <u>Id.</u> (citation omitted).

Although defendants are subject to qualification and regulation by the state, "the mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." <u>See</u> <u>Blum v. Yaretsky</u>, 457 U.S. 991, 1004 (1982). That police can bring those in need of immediate treatment to SCMC pursuant to Or. Rev. Stat. § 426.228 also does not by itself convert defendants' action into that of the state. <u>See</u> <u>Nash v. Lewis</u> ("<u>Nash II</u>"), 2004 WL 2966913, *3-4 (D.Or. Dec. 21, 2004). Here, the intended benefits of a private hospital flow directly to those in need of medical treatment, in whose interests doctors and medical staff must act; in other words, because the state does not intrude upon defendants' professional decision-making, there can be no state action. <u>See, e.g.</u>, <u>Chasse</u>, 2009 WL 3334912 at *6-12 (no state action under the joint action or nexus test where emergency medical services were rendered by a private company and its staff, even where that

Page 53 - OPINION AND ORDER

company was heavily regulated by Oregon law, distinguishing <u>Jensen v. Lane Cnty.</u>, 222 F.3d 570 (9th Cir. 2000); <u>Polk Cnty. v. Dodson</u>, 454 U.S. 312 (1981); and <u>Blum</u>, 457 U.S. 991); <u>see also</u> <u>Parks Sch. of Bus., Inc. v. Symington</u>, 51 F.3d 1480, 1486 (9th Cir. 1995) (no joint action exists where "benefits of [state-law designated loan guarantor] flow directly to students, not to the state itself," even while "in a broad sense" conferring public benefits). Therefore, defendants were not acting under color of state law pursuant to this test.

   iii. <u>Compulsion Test</u>

  The compulsion test examines whether "the coercive influence or significant encouragement of the state effectively converts a private action into a government action." <u>Kirtley</u>, 326 F.3d at 1094 (citation and internal quotations omitted). Doctors, private hospitals, and medical staff act independently of the state, exercising obligations that are, by law, to those in need of medical care. Thus, it does not follow that defendants here are under such government compulsion solely by virtue of the state's qualification and regulation requirements to conclude that they were acting on behalf of the state.

   iv. <u>Nexus Test</u>

  "Arguably the most vague of the four approaches, the nexus test asks whether there is a such a close nexus between the State and the challenged action that the seemingly private behavior may be fairly treated as that of the State itself." <u>Id.</u> at 1094-95

Page 54 - OPINION AND ORDER

(citation and internal quotations omitted).  As discussed above, there are significant links between defendants' positions and the government.  As plaintiff points out, defendants are regulated, in part, by the government and are qualified to receive and treat mentally ill patients pursuant to Oregon law.  In addition, Oregon law authorizes police officers, who are state actors, to participate in the identification and transportation of those in need of mental health services.

Nonetheless, the individually named defendants are not appointed or paid by the state, and SCMC is neither created nor compensated by the state.  More importantly, the state does not direct a specific outcome in regard to the medical care defendants provide; rather, those decisions lie within defendants' sole discretion.  While they are required to report to the state under certain circumstances, defendants do so as independent parties.  Further, the police neither participated in plaintiff's medical care nor in the development or implementation of SCMC's polices.  As such, there is no evidence that the state has so far insinuated itself into a position of interdependence with defendants that it could be considered a joint participant in the challenged conduct.

Thus, while the provision of medical services to the mentally ill can satisfy the above-listed tests, on the record before the Court, the actions of defendants in this case cannot be fairly attributed to the state.  See Nash II, 2004 WL 2966913 at *2-4 (ED doctor who worked at private hospital and who initiated involuntary

Page 55 - OPINION AND ORDER

civil commitment proceedings, without first examining plaintiff or consulting a second physician, as required by Oregon law, and based on false statements from the police officers who placed plaintiff in custody, was not acting under color of state law, distinguishing Jensen, 222 F.3d 570); see also Chasse, 2009 WL 3334912 at *6-12; Dark v. MacDonald, 2005 WL 906487, *3 (D.Or. Apr. 15, 2005); Sturm v. El Camino Hosp., 2010 WL 725563, *2-5 (N.D.Cal. Feb. 26, 2010); Pino v. Higgs, 75 F.3d 1461, 1465-67 (10th Cir. 1996).

Therefore, SCMC, Palmer, Timms, Ryan, Violet, Huffman, Lancaster, McBride, Beutler, and Nelson were not acting under color of state law.  Accordingly, defendants' motions are granted.

C.   Fourth Amendment Claim Against the City, Namanny, and Macdonnell

Plaintiff asserts that the "individual Defendant Police Officers violated Plaintiff's Fourth Amendment rights against unlawful and unreasonable search and seizures when they participated in physically restraining" her.  TAC ¶ 74.  It is undisputed that there is a federally recognized liberty interest to be free from unreasonable searches and seizures under the Fourth Amendment.  See Crater v. Galaza, 508 F.3d 1261, 1269 (9th Cir. 2007), cert. denied, 554 U.S. 922 (2008) (noting the fundamental nature of this right).  Nevertheless, for the reasons discussed in section III(A), plaintiff's Fourth Amendment claim against the City fails.  Accordingly, the City's motion is granted in this regard and plaintiff's motion is denied.

## CONCLUSION

Palmer's motions for summary judgment (docs. 75, 132) are GRANTED.  In addition, COEP's motion for summary judgment (doc. 125) is GRANTED.  The City's motion for summary judgement (doc. 128) is also GRANTED.  Further, SCMC's and Timms' motion for summary judgment (doc. 135) is GRANTED.  Ryan's, Violet's, Huffman's, Lancaster's, Mcbride's, Beutler's, and Nelson's motion for summary judgment (doc. 168) is GRANTED as well.  Conversely, plaintiff's partial motions for summary judgment (docs. 58, 120) are DENIED.  The parties' requests for oral argument are DENIED as unnecessary.  Accordingly, plaintiff's claims against COEP, Palmer, SCMC, Timms, Ryan, Violet, Huffman, Lancaster, Mcbride, Beutler, Nelson, the Bend Police Department, and the City are DISMISSED. The only remaining claims are those asserted against Namanny and Macdonnell.

IT IS SO ORDERED.

Dated this _6th_ day of March 2013.


_____
Ann Aiken
United States District Judge